1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   BEN EWING,

11              Petitioner,                    No. CIV S-04-0858 GEB DAD P

12        vs.

13   TOM CAREY, Warden,

14              Respondent.              FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

18   entered against him in the Sacramento Superior Court on charges of robbery, false imprisonment,

19   and assault with a semiautomatic firearm.  He seeks relief on the grounds that: (1) his statements

20   to police were improperly admitted at his trial in violation of the U.S. Supreme Court's decision

21   in Miranda v. Arizona; (2) his right to due process was violated when the trial court refused to

22   allow him to impeach a prosecution witness with evidence of the witness's motivation to lie; and

23   (3) his right to due process was violated by jury instruction error.  Upon careful consideration of

24   the record and the applicable law, the undersigned will recommend that petitioner's application

25   for habeas corpus relief be denied.

26   /////

1

PROCEDURAL AND FACTUAL BACKGROUND[1]

A jury convicted defendant Ben Ewing of five counts growing out of events at a Circuit City store in Sacramento on July 8, 2000: robbery of Loretta Moritz (count 1; Pen. Code, § 211)[2]; false imprisonment of Moritz by violence or menace (count 2; § 236); assault with a semiautomatic firearm on Marcus Paras (count 3; § 245, subd. (b)); false imprisonment of Paras (count 4; § 236), and assault with a semiautomatic firearm on Kok Yap (count 5; § 245, subd. (b)).  The jury also found that defendant was vicariously armed as to all counts (§ 12022, subd. (a)(1)).

\* \* \*

On the night of July 8, 2000, Adam Fairbanks robbed his former place of employment, the Circuit City store on Florin Road in Sacramento.  Defendant, a current store employee, handed Fairbanks the store's cash receipts for the day and tied the hands of his fellow employees on the premises, while Fairbanks pointed a gun at him.  Before leaving, Fairbanks shot defendant in the shoulder.

According to Fairbanks, he and defendant jointly planned the robbery, including the shooting.  According to defendant, Fairbanks acted alone.  The jury evidently found Fairbanks the more credible.

**Prosecution case**

Fairbanks testified he had pled guilty to robbery with a gun in exchange for a maximum prison sentence of eight years if he testified truthfully against defendant.  If he had not pled, he could have faced 15 years for the robbery and gun use charges, and additional time for other charges.

Fairbanks, 24 years old at the time of trial, met defendant several years before the robbery when they both worked for Circuit City in Redding.  They became best friends.

In 1999, Fairbanks and defendant separately moved to Sacramento, where they continued to work for Circuit City; they eventually moved into the same apartment complex.  Fairbanks was a manager at the Florin Road store, but was demoted and transferred

---

[1]  The following summary is drawn from the May 2, 2003 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 1-12, filed in this court as Ex. D to respondent's answer.

[2]  All further undesignated section references are to the Penal Code.

to a different store in February 2000.  Defendant continued to work at the Florin Road store as a management trainee.

By early June 2000, Fairbanks, whose wife was pregnant, was having financial difficulties; according to him, defendant was also experiencing "a little financial problem" at that time.[3]  At defendant's apartment, he and Fairbanks jokingly discussed robbing Circuit City as a way to solve their problems.  Although they did not make any plans, they remarked on the fact that they knew the location of the cash office and video security cameras at the Florin Road store, and defendant said he could check the work schedules to see who would be on at any given time.

According to Fairbanks, in mid-June he and defendant again discussed robbing the store.  This time they were serious and made detailed plans.  The robbery would happen on a Saturday, the store's most lucrative day, just before the staff closed up for the night, and on a day when employees who knew Fairbanks well would not be there.  (Defendant had learned that the managers they most wished to avoid would be off on Saturday, July 8; therefore they picked that date, even though Marcus Paras, a manager who knew Fairbanks and lived at the same apartment complex as the conspirators, would be on duty.)  Defendant would check the store computer on that day to see how much money was in the store.  As closing time approached, he would "mess up" the transfer of cash from registers to the cash office, to gain time to get lower-level employees out before the manager in charge put the day's receipts into an inaccessible safe.  Fairbanks would enter around 8:00 p.m. and defendant would open a locked "phone room" for him to hide in until the store closed to the public.  Fairbanks would apparently be the sole robber, wearing a jacket, gloves, and ski mask, and brandishing a gun, but saying nothing for fear an employee might recognize his voice.  Defendant would do all the talking, but would appear to be a "hostage" relaying Fairbanks's orders, thus making it look more "real."  Fairbanks would bring the gloves, the ski mask, and zip ties to tie the employees' hands; defendant would

---

[3]  On cross-examination, Fairbanks was impeached with his preliminary hearing testimony that defendant was not in the same financial straits as Fairbanks and only needed some money to fix a crashed motorcycle.  On redirect, however, Fairbanks testified that defendant temporarily left Circuit City to work at a motorcycle shop, but returned because he was "hurting for money"; his home phone had been disconnected.

The prosecution also put on other evidence of defendant's financial difficulties.  John Stanton, the Florin Road store manager, believed defendant's earnings were down in July 2000, possibly because he had just started working in a new section.  Barbara Cooksey, a subordinate manager at the store in July 2000 and a confidant of both defendant and Fairbanks, believed defendant had wrecked a motorcycle and needed $6,000 to repair it.

supply the jacket and gun.  (Fairbanks knew defendant owned several firearms, including a .25-caliber semiautomatic.)

In early July, they decided Fairbanks would shoot defendant in the arm or shoulder just before leaving the store, so that defendant could collect workers' compensation.  They had heard that a Circuit City employee got $7 million for a work accident, so they guessed defendant could get $20 million.

On July 8, defendant and Fairbanks spoke twice on the telephone to confirm that "the plan was still on."  Sometime after 7:00 p.m., Fairbanks drove to the Florin Road store.  He entered through the front door, casually walked back to the phone room, went in through the unlocked door, locked it, and waited.  After knocking with a prearranged signal, defendant came in and gave Fairbanks the jacket and gun.  Fairbanks stayed there until around 9:30 p.m., when defendant came back and said it was time.  Fairbanks handed defendant the gun, which was unloaded; defendant put a bullet in and returned it to him.  In the hallway, as planned, Fairbanks punched defendant several times in the face to bruise him and "make it look like a . . . more real robbery."

As they approached the cash office, defendant and Fairbanks encountered Marcus Paras.  Defendant told him they were being robbed; Paras did not believe it until he saw the masked gunman.  Observing the gunman's eyes, which were distinctive in shape and color, Paras concluded it was Fairbanks, as he later told the police.  On defendant's orders, Paras lay down.  Fairbanks threw defendant his bag of zip ties; defendant tied Paras's hands behind his back.  (After the robbery was completed, defendant came back and cut the ties off.)

Defendant knocked on the cash office door.  He identified himself to the manager inside, Loretta Moritz, who had worked with defendant for the last two months and trained him on the "cash out" procedure.  She let him in, while Fairbanks went up to the door.  Again, defendant announced they were being robbed, but Moritz did not believe it until she saw the masked man holding a gun on her.  Defendant had her lie down and tied her hands.  Then he emptied money from the cash drawers into a deposit bag.[4]  Fairbanks said the single word "safe" to defendant, who replied that he could not open it.  Defendant handed Fairbanks the bag of money, which he put in his jacket pocket.  They left the cash office, closing the door behind them.  By mistake, Fairbanks left the bag of zip ties in the office; defendant returned and picked it up.

---

[4]  The store's videotaping system captured the robbery.  The tape was played several times for the jury as witnesses commented on it.

4

After leaving the office, defendant and Fairbanks ran into Kok Yap, a management trainee. Fairbanks pointed the gun at him, and defendant ordered him to lie down but did not tie his hands.

On the way toward a back exit, defendant and Fairbanks stopped to go through with the shooting; according to Fairbanks, he was reluctant, but defendant said Fairbanks had to do it because Paras had recognized him. Defendant put the muzzle of the gun on his shoulder and Fairbanks fired. In his haste to get out, Fairbanks neglected to pick up the expelled casing from the floor.[5] He ran out the back door, setting off an alarm. Defendant then returned to the company of the other employees, his arm bleeding, and told them the robber was gone.

After driving away, Fairbanks took the money out of his jacket, then threw the gun, the jacket, the ski mask, his boots, and his gloves into a dumpster. On his return home, his mother told him about the robbery and the shooting. He went to the hospital to visit defendant, who said he had picked up the expended shell casing and thrown it into the back parking lot.[5] Fairbanks told him their take from the robbery was about $12,000. After defendant got out of the hospital, he and Fairbanks split the money, $6,000 to defendant about $5,600 to Fairbanks (defendant getting more because he was shot).

Defendant gave a statement at the hospital to Sacramento Police Officer Book. Defendant claimed the robber had taken him by surprise as he worked and ordered him around at gunpoint before shooting him.

Sacramento County Sheriff's Deputy Rye contacted defendant because Marcus Paras had suggested Fairbanks, defendant's best friend, might have been the robber. Defendant did not return Rye's first phone call. When Rye called back, defendant tried to put him off, but Rye insisted he come in. Defendant came in the next morning. Rye videotaped the ensuing interview.[6]

Defendant repeated his story that the robber had surprised him and ordered him to assist in the robbery, then said the robber's eyes were green (Fairbanks's were bright blue) and his voice sounded "older." Told that Paras had said the robber's eyes were the same color as Fairbanks's, defendant replied that he did not know if Fairbanks was the robber. Rye asserted defendant knew Fairbanks

---

[5] An investigating officer found the expended bullet and a bullet hole in the wall, but not the casing. He concluded the bullet was .25 caliber and was fired from a semiautomatic handgun.

[6] The videotape was played for the jury, and a transcript was provided.

5

was the robber and might have known of his plans beforehand, but probably was not involved; he urged defendant to be honest, telling him it would be a crime to withhold information.[7]  Defendant admitted Fairbanks might be guilty, but if so defendant did not want to know it.

Rye proposed that the robbery was an inside job planned by Fairbanks and acquiesced in by defendant.  Defendant then claimed Fairbanks had approached him talking about money problems; defendant himself had none.  Eventually, defendant told Rye that Fairbanks had disclosed his robbery plans about a week beforehand, down to the specific date; though defendant knew about it in advance, he did not take any active part in it.  He assumed Fairbanks hit him to make it look real, then shot him to protect him from suspicion.

Defendant agreed to make a recorded phone call to Fairbanks to discuss the robbery, in which he would follow a script prepared by Rye.  He made the call, but did not follow instructions:  he asked Fairbanks the unscripted question whether Fairbanks had got rid of the gun (to which Fairbanks said yes).

The next day, defendant told Fairbanks about the interview with Rye and suggested Fairbanks flee to Costa Rica before he was arrested.  Fairbanks did not flee.  After his arrest, he gave the police a videotaped statement admitting his and defendant's roles in the crime; the tape was played for the jury.

**Defense case**

Defendant testified on his own behalf.  He also put on family members and his girlfriend to corroborate his story.

According to defendant, the first, joking conversation about robbing Circuit City which Fairbanks recounted actually happened, but when Fairbanks brought the subject up again and sounded serious, defendant said "no way."  They never met or spoke to plan the robbery.  Fairbanks gave him notice of the robbery a few weeks before, and again on the actual date, but defendant did not believe he meant it.

According to defendant, he was not in financial difficulty in the period leading up to the robbery.  In addition to his regular income of $900 to $1,500 a month from Circuit City, he earned several hundred dollars a month by setting up computers for people and tutoring them on how to use their systems.  His home phone was

---

[7] Rye also made deliberate misstatements about the state of the evidence, which he termed "ruses" in his testimony.

6

canceled only because he saw no need to keep it up; he had a cell phone and he was usually at work or at his girlfriend's house. He also did not need money to repair his motorcycle; his accident happened only four days before the robbery, and all repairs were paid for by his family or a settlement with the other person involved in the accident.

Defendant and Fairbanks had keys to each other's apartments. Fairbanks knew defendant kept a .25-caliber handgun in a case under his bed. After the robbery, defendant discovered it was missing.

On the night of July 8, as defendant was cleaning a refrigerator in the appliances section of the store, Fairbanks surprised him, hitting him on top of the head, then ordering him at gunpoint to tie up the other employees and show him where the cash was. Shocked and intimidated, and wanting only to "get him through and get him out," defendant complied. Afterwards, Fairbanks apologized for shooting defendant, saying "Marcus recognized me."

Defendant evaded the police because he feared he would be in trouble for concealing his advance knowledge of Fairbanks's plans; he wanted to talk to a lawyer first. His uncertainty about his legal status also explained his attempts to mislead Detective Rye in the early part of his interview.

After defendant's taped phone conversation with Fairbanks, Fairbanks seemed to become suspicious; they arranged to meet in person, but Fairbanks canceled the meeting. In the meantime, defendant had consulted a criminal defense lawyer who told him that mere advance knowledge of the robbery did not make him guilty. Defendant then rebuffed Fairbanks's attempts to speak to him.

Defendant's brothers, father, mother, and girlfriend corroborated defendant's denials of robbery planning sessions with Fairbanks. They testified that defendant was out of town at one of the times Fairbanks had given, and that they were with defendant constantly at other times Fairbanks had given and never saw Fairbanks.

Defendant's brother Matt Roberts, his mother, and his girlfriend also testified defendant had had a motorcycle accident on July 4, 2000. The damage came to $1,515, the motorcycle was insured, and the driver at fault settled for $900. Defendant's girlfriend further testified that though he had no income at one point, he received money from his parents.

Defendant's mother also testified she came to Sacramento on July 12, 2000, to take defendant to appointments with Detective Rye and a workers' compensation attorney. This testimony

7

corroborated defendant's claim that he did not make an appointment with a workers' compensation attorney, but "was set up for" the appointment.

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

/////

/////

8

1  28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

2  Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

3         The court looks to the last reasoned state court decision as the basis for the state

4  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

5  court reaches a decision on the merits but provides no reasoning to support its conclusion, a

6  federal habeas court independently reviews the record to determine whether habeas corpus relief

7  is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

8  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

9  reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

10  AEDPA's deferential standard does not apply and a federal habeas court must review the claim

11  de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

12  1167 (9th Cir. 2002).

13  II.  Petitioner's Claims

14      A.  Petitioner's Statements to Police

15         Petitioner's first claim is that his federal constitutional rights were violated when

16  the trial court denied his motion to suppress the statements he made to the police detective who

17  interrogated him about the robbery.  Specifically, petitioner contends that his statements were

18  obtained during a custodial interrogation in violation of his rights pursuant to Miranda v.

19  Arizona.  (Pet. at 24-20.)

20         The California Court of Appeal fairly described the facts surrounding this claim as

21  follows:

22       In response to motions in limine, the trial court held a hearing
     pursuant to Evidence Code section 402 (the 402 hearing) to

23       determine whether defendant's admissions to Detective Rye were
     obtained in violation of Miranda.  At the 402 hearing, Rye testified

24       and the trial court was given a transcript of his interview with
     defendant.

25

26       Rye, a 25-year veteran of the Sacramento County Sheriff's
     Department who was working in July 2000 as a detective in the

9

robbery bureau, testified that he called defendant's home on July 10 and left a message which was not returned.  On July 11, he called again.  Defendant said he had not called back because he was busy and a lot of things were going on in his life.  When Rye asked him to come in and talk, he said he would get back to Rye.  After further pressure, defendant promised to call back in five minutes, then did so and arranged to come to Rye's office the next day at 9:00 a.m.

Defendant came in, accompanied by his mother.  Rye told him in her presence that he would "need about [a] half hour of [defendant's] time."  Rye also said he was looking at defendant as a victim, not a suspect, and defendant was free to go at any time.  Rye then escorted him to an interview room.  As defendant sat there, Rye went to the next room to set up and turn on a videotape.

Before beginning the interview, Rye reiterated defendant was free to leave.  He said so again "[w]hen the focus of attention was just turning from a victim to where I was focusing my attention on [defendant] as a suspect."[8]  Defendant was never restrained in any way.

At the end of the interview, Rye asked if defendant would make a phone call to Adam Fairbanks to elicit incriminating statements.  Defendant did so.  Then Rye escorted him back to the reception area and told him he was free to go; he and his mother left.  During the approximately two hours defendant was at the station, he never asked to leave.

Rye did not give defendant Miranda advisements, out of "concern[]" that he might ask to consult a lawyer.  "To get around that, I went according to what I had been taught to get around Miranda, and that is to instill in him that this was not an in custody interrogation.  That it was merely an opportunity for me to learn more about the crime.  And that's why on several occasions I had reminded him from the beginning to the middle that he was not going to be arrested."

On cross-examination, defense counsel asked whether Rye did not already believe defendant to be a suspect near the beginning of the interview, when Rye repeatedly urged him to be truthful.  Rye denied it, saying:  "You know, I think it depends on how you define suspect.  There's some focus of attention on [defendant], but I'll just leave it at that."  Rye found it "unusual" or "suspicious" that the robber shot defendant in the arm, that defendant did all the talking during the robbery, that defendant seemed reluctant to talk

---

[8]  The first such statement by Rye in the 101-page transcript of the interview appears at page 82, after Rye asserted, and defendant admitted, that Fairbanks robbed the store and defendant had talked about the plan with him ahead of time.

to Rye, and that defendant asked whether Rye was going to arrest him.

Asked whether Adam Fairbanks had not already been identified as the robber, Rye said the evidence – Marcus Paras's opinion that the suspect had blue eyes and was about the same stature as Fairbanks – was "extremely weak" and not "an identification by any means of imagination."

Rye testified the interrogation room had no key and an interviewee could get out unless Rye locked the door from the outside. He did not believe he had done that.

Rye admitted he did not say defendant was free to go at any point in the early stage of the interview, but repeated that he had said so before the interview began. He acknowledged that by the first time he said so during the interview he had already said Fairbanks was the robber, defendant was not being honest, and defendant's lack of honesty was a crime. Asked if defendant was a suspect by this point, Rye said: "I would say the evidence is mounting." However, Rye did not think he had probable cause to arrest defendant at that time. Rye explained that his suspicion of defendant grew after the interview, when defendant failed to follow the script during the phone call to Fairbanks. (Rye admitted, however, that although he recorded the call, he no longer had the micro cassette recording or his notes.)

Defense counsel argued defendant was in custody at least by the point in the interview when Rye accused him of lying and being involved in the crime. The prosecutor replied there was no custody because Rye repeatedly told defendant he could leave, the interrogation room door was always open or ajar, defendant was never handcuffed or restrained, and defendant never asked to leave.

The trial court ruled defendant was not in custody, so there was no Miranda violation, and his statements were freely and voluntarily made.

Rye thereafter testified before the jury as we have recounted in our statement of facts.

(Opinion at 12-16.)

Petitioner claims that he was "in custody" during the interview with Detective Rye and that he should have been given Miranda warnings. Petitioner notes that during the interview Rye accused him of being responsible for the robbery and argues that "at that point, a reasonable person in petitioner's situation would have believed himself to be under arrest." (Pet. at 24.)

11

1  Petitioner argues that two factors in this case would have led a reasonable person to believe he

2  was essentially under arrest and not free to leave: (1) the interrogation took place at the police

3  station; and (2) Rye informed petitioner of the evidence indicating he was involved in the

4  robbery.  (Id. at 27.)

5           In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court

6  held that the Fifth Amendment privilege against self-incrimination prohibits the admission into

7  evidence of statements given by a suspect during "custodial interrogation" without a prior

8  warning.  Id. at 444.  Custodial interrogation means "questioning initiated by law enforcement

9  officers after a person has been taken into custody or otherwise deprived of his freedom of action

10  in any significant way."  Id.  Whether a suspect is "in custody" for purposes of Miranda requires

11  application of an objective test.  Yarborough v. Alvarado, 541 U.S. 652, 662-63 (2004).  Two

12  inquiries are necessary for a determination of an individual's "in custody" status: (1) the overall

13  circumstances surrounding the interrogation; and (2) given those circumstances, whether a

14  reasonable person in the suspect's situation would have felt free to terminate the interrogation

15  and leave.  Id.; Thompson v. Keohane, 516 U.S. 99, 112 (1995); see also Stansbury v. California,

16  511 U.S. 318, 322 (1994) ("the ultimate inquiry is simply whether there [was] a formal arrest or

17  restraint on freedom of movement of the degree associated with a formal arrest") (quoting

18  California v. Beheler, 463 U.S. 1121, 1125 (1983)); Berkemer v. McCarty, 468 U.S. 420, 442

19  (1984) (custody must be determined based on a how a reasonable person in the suspect's situation

20  would perceive his circumstances and "[a] policeman's unarticulated plan has no bearing on the

21  question whether a suspect was 'in custody' at a particular time").  The protections provided by

22  Miranda attach only when an individual is both in custody and being interrogated.  See McNeil v.

23  Wisconsin, 501 U.S. 171, 182 n.3 (1991) ("We have in fact never held that a person can invoke

24  his Miranda rights anticipatorily, in a context other than 'custodial interrogation'. . . .");  Edwards

25  v. Arizona, 451 U.S. 477, 484-85 (1981) (holding that an accused has the right to have counsel

26  present during custodial interrogation).

1    The state appellate court concluded that petitioner was not in custody when he

2    answered Detective Rye's questions at the police station and that, therefore, his statements were

3    not obtained in violation of Miranda.  The state appellate court reasoned as follows:

4        Miranda advisements are required only in custodial interrogations.
         Therefore, we must determine whether defendant was in custody
5        during his interview with Detective Rye – "that is, whether
         examining all the circumstances regarding the interrogation, there
6        was a '"formal arrest or restraint on freedom of movement' of the
         degree associated with a formal arrest.' (California v. Beheler
7        (1983) 463 U.S. 1121, 1125.)  As the United States Supreme Court
         has instructed, 'the only relevant inquiry is how a reasonable man
8        in the suspect's shoes would have understood his situation.'
         (Berkemer v. McCarthy (1984) 468 U.S. 420, 422, fn. omitted.)"
9        (People v. Stansbury (1995) 9 Cal.4th 824, 830 (Stansbury).)  In
         doing so, we disregard the officer's uncommunicated subjective
10       impressions as irrelevant because they had no bearing on how a
         reasonable person in defendant's position would have perceived
11       the situation.  (Ibid.)  In reviewing the trial court's ruling, we
         accept the court's resolution of conflicting evidence if supported by
12       the record, but independently review its conclusions of law.  (Id. at
         p. 831.)
13
         The trial court found that Detective Rye repeatedly advised
14       defendant he was free to leave, and no facts indicated otherwise.
         Similarly to Stansbury, supra, 9 Cal.4th 824, Rye permitted
15       defendant to come in on his own and conveyed to him that he was
         not being viewed as a suspect.  Any private suspicion Rye may
16       have had at the beginning of the interview, but did not
         communicate to defendant, is immaterial to how a reasonable
17       person in defendant's position would have understood the
         situation.  (See id. at pp. 830, 832.)  The fact that the interview
18       took place at a police station did not suffice to render it custodial.
         (Id. at p. 833; Oregon v. Mathiason (1977) 429 U.S. 492, 495.)
19       Nor did the fact that Rye eventually told defendant he was under
         suspicion of criminal involvement in the robbery.  (Ibid.; see also
20       Stansbury v. California (1994) 511 U.S. 318, 325 [some suspects
         free to come and go until police decide to make arrest].)  The test is
21       whether a reasonable person in defendant's position would have
         felt free to leave.  Here, given Rye's assurances, even after voicing
22       his suspicions, that defendant was free to leave, and the lack of any
         evidence to the contrary, defendant could not reasonably have
23       believed he was in custody.

24       People v. Boyer (1989) 48 Cal.3d 247, on which defendant mainly
         relies, is distinguishable.  There, the police began by coercing the
25       defendant into coming with them to the station.  Then they gave
         him Miranda advisements, thus making clear he was in custody.
26       Then they questioned him in a harshly accusatory manner, leading

13

1   him to believe they had already determined he was a murderer and
2   only wanted to know his reasons for doing the crime. When he
    asked if he was under arrest, they did not directly respond, but their
3   answers would have led a reasonable person to conclude he was.
    (Id. at pp. 263-268, 272.) Contrary to defendant's argument, the
4   mere fact of an accusation is not enough to bring this case within
    the holding of Boyer.

5   People v. Storm (2002) 28 Cal.4th 1007, also cited by defendant, is
    inapposite. There, the defendant was initially questioned in a
6   custodial interview, received Miranda warnings, and invoked his
    right to counsel, but after doing so was improperly questioned by a
7   polygraph examiner and gave incriminating evidence. He was
    allowed to leave. Two days later, police came to his home, told
8   him he would not be arrested, and interviewed him again without
    new Miranda warnings; he expanded on his incriminating story.
9   The Supreme Court held that there had been a break in custody
    before the second interview, so that the statements obtained in that
10  interview were admissible even if those from the first interview
    were not. (Id. at pp. 1012-1013, 1021-1038.) The case simply
11  does not stand for the proposition for which defendant cites it –
    that accusations (here, those allegedly made by the polygraph
12  examiner) prove a suspect is in custody.[9]

13  The trial court correctly found that defendant's statements to
    Detective Rye were not obtained in violation of Miranda because
14  defendant was not in custody during the interview.

15  (Opinion at 16-19.)

16      The question before this court is whether the state courts' adjudication of the

17  Miranda issue raised by petitioner "involved an unreasonable application" of clearly established

18  federal law when the state court concluded that petitioner was not in custody when he was

19  interrogated by Detective Rye. 28 U.S.C. § 2254(d)(1). Under this standard, petitioner is not

20  entitled to federal habeas relief. Petitioner came into the police station voluntarily and was told

21  several times during Detective Rye's interview that he could leave at any time. There was no

22  physical restraint on his movements. After the interview was concluded, petitioner left the police

23  station without being arrested. See Beheler, 463 U.S. at 1121-22 ( holding that Miranda

24

25      [9] Defendant mistakenly cites the Supreme Court's characterization of the Court of
    Appeal's holding as the holding of the Supreme Court itself. (People v. Storm, supra, 28 Cal. 4th
26  1007, 1020-1021.)

1   warnings are not required when a suspect voluntarily comes to the police station, is not placed

2   under arrest and is allowed to leave unhindered after a brief interview); Oregon v. Mathiason,

3   429 U.S. 492, 495 (1977) (suspect not "in custody" for purposes of Miranda where he came

4   voluntarily to the police station, was immediately informed that he was not under arrest, and left

5   the police station "without hindrance" at the close of a 1/2-hour interview); United States v.

6   Norris, 428 F.3d 907, 912 (9th Cir. 2005) (suspect was not in custody where he voluntarily

7   accompanied officers to a police substation, was told his cooperation was voluntary and that he

8   was free to terminate the interview at any time and was taken home by officers at the conclusion

9   of the interview);  United States v. Crawford, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc)

10   (holding that a defendant was not in custody when he accompanied the officers to an FBI office,

11   the officers told him that he was not under arrest and was free to leave and the officers drove him

12   home after the interview).

13           Although Detective Rye almost certainly believed that petitioner was involved in

14   the robbery with Fairbanks, perhaps even before petitioner came to the police station to be

15   interviewed, this fact is irrelevant to the question of whether petitioner believed he was in

16   custody.  See Berkemer, 468 U.S. at 442 (although the interrogating officer reached the decision

17   to arrest the driver at the beginning of the traffic stop, the driver was not "in custody" for

18   purposes of Miranda because the officer did not communicate that intent to the driver);

19   Stansbury, 511 U.S. at 323 (explaining that "the initial determination of custody depends on the

20   objective circumstances of the interrogation, not on the subjective views harbored by either the

21   interrogating officers or the person being questioned"); United States v. Kim, 292 F.3d 969, 973

22   (9th Cir. 2002) ("The ['in custody'] inquiry focuses on the objective circumstances of the

23   interrogation, not the subjective views of the officers or the individual being questioned.")

24   Because Detective Rye did not make his suspicions known to petitioner at the time he was being

25   questioned, Rye's state of mind has no bearing on whether petitioner was "in custody."  Further,

26   contrary to petitioner's argument, the mere fact that the interview took place at the police station,

1    or that Detective Rye suggested petitioner was involved in the robbery did not render the

2    interrogation "custodial."  See Mathiason, 429 U.S. at 495 (a non-custodial interrogation "is not

3    converted to one in which Miranda applies" simply because the questioning took place at the

4    police station); Stansbury v. California, 511 U.S. 318, 325 (1994) ("even a clear statement from

5    an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the

6    custody issue, for some suspects are free to come and go until the police decide to make an

7    arrest").

8            The facts of this case are strikingly similar to those confronted by the U.S.

9    Supreme Court in Yarborough.  There, the court found that the following facts weighed against a

10   finding that the defendant was in custody at the time he was questioned: (1) the police did not

11   transport the defendant to the police station or require him to appear at a particular time; (2) the

12   police did not threaten the defendant or suggest he would be placed under arrest; (3) the

13   defendant's parents remained in the lobby during the interview, suggesting that the interview

14   would be brief; (4) the defendant and his parents were told that the interview was "not going to

15   be long;" (5) during the interview, the detective focused on the crimes of petitioner's partner

16   rather than petitioner's acts; and (6) at the end of the interview, the defendant went home.  541

17   U.S. at 664.  All of these factors, which the Supreme Court concluded were "consistent with an

18   interrogation environment in which a reasonable person would have felt free to terminate the

19   interview and leave," (541 U.S. at 664-65), were also present in the instant case.

20           The factors weighing in favor of the view that the defendant in Yarborough was in

21   custody were the following: (1) the police interview lasted two hours; (2) the officer did not tell

22   the defendant he was free to leave; (3) the defendant was brought to the police station by his legal

23   guardians rather than arriving on his own accord, "making the extent of his control over his

24   presence unclear;" and (4) the defendant's parents asked to be present at the interview but were

25   rebuffed.  Id. at 665.  In this case, only two of these factors are present: the interview with

26   Detective Rye lasted approximately two hours, and petitioner was brought to the police station by

16

1   his mother.  However, contrary to the facts in <u>Yarborough</u>, here petitioner's mother was not

2   barred from the interview and Detective Rye told petitioner several times that he was free to

3   leave.

4           Given these facts, this court cannot say that the state court's determination on this

5   issue was contrary to or an unreasonable application of clearly established federal law, as set

6   forth in the decisions discussed above.  Accordingly, petitioner is not entitled to relief on his

7   claim that the admission into evidence at trial of his statements to Detective Rye violated his

8   <u>Miranda</u> rights.

9       B.  <u>Limitation on Cross-Examination of Fairbanks</u>

10          Petitioner claims that the trial court violated his right to due process when it

11  refused to allow him to cross-examine prosecution witness Adam Fairbanks about whether

12  Fairbanks had a motive to testify falsely against petitioner.  (Pet. at 31-33.)  The California Court

13  of Appeal fairly described the facts surrounding this claim as follows:

> At the start of trial, the prosecutor moved to bar the defense from
> referring to the possibility that Fairbanks faced a life sentence,
> because he had not been charged with attempted murder.  The trial
> court deferred ruling on the issue until more evidence had been
> presented, but in the meantime barred defense counsel from
> mentioning such possible exposure.
>
> In his direct examination, as indicated above, Fairbanks testified
> that after his plea he faced a prison sentence of five to eight years;
> sentencing had been continued.  On cross-examination, he testified
> that absent his plea agreement he would have faced a total of 12
> and a half years on the robbery charge (15 years with 85 percent
> time served).  On redirect, his videotaped interview with Detective
> Rye and the transcript of the interview were introduced into
> evidence, over a defense objection.  During the interview Fairbanks
> suggested he believed an attempted murder charge might lie for
> shooting defendant, and Rye said if Fairbanks were charged as a
> "lone gunman" he could get 20 years in prison.  The trial court
> instructed the jury not to draw any conclusions from Rye's remark
> about 20 years.  At no point did defense counsel remind the court
> that it had deferred a final ruling on whether counsel could cross-
> examine Fairbanks about his potential attempted-murder exposure,
> or ask the court to make such a ruling.

26  (Opinion at 21-22.)

17

1    The state appellate court rejected petitioner's argument that his due process rights

2    had been violated, concluding that petitioner was not prejudiced by his inability to question

3    Fairbanks about whether he faced a possible sentence for the attempted murder of petitioner.

4    The court explained its reasoning as follows:

5          In any event, we see no possible prejudice from the lack of cross-
           examination on this point.  Both trial counsel brought out the fact
6          that Fairbanks stood to get a far shorter sentence through his plea
           agreement and testimony against defendant than he would have
7          been likely to get otherwise.  Furthermore, the jury was properly
           instructed that it should consider a witness's bias, interest, or other
8          motive in assessing his credibility (CALJIC No. 2.20), and that if
           any crimes were committed by anyone, Fairbanks was an
9          accomplice as a matter of law.  (CALJIC No. 3.16.)  Given these
           facts, it could not have mattered whether the jury knew Fairbanks
10         might have been charged with attempted murder.

11   (Id. at 23.)

12   Absent some federal constitutional violation, a violation of state law does not

13   provide a basis for habeas relief.  Estelle v. McGuire, 502 U.S. at 67-68.  Accordingly, a state

14   court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders

15   the state proceedings so fundamentally unfair as to violate due process.  Drayden v. White, 232

16   F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v.

17   Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

18   The right to confront witnesses, guaranteed by the Sixth and Fourteenth

19   Amendments, includes the right to cross-examine adverse witnesses to attack their general

20   credibility or show their possible bias or self-interest in testifying.  Olden v. Kentucky, 488 U.S.

21   227, 231 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986); Davis v. Alaska, 415

22   U.S. 308, 316 (1973); United States v. Larson, 460 F.3d 1200, 1206 (9th Cir. 2006).  A

23   Confrontation Clause violation occurs where the defendant is prevented from investigating "a

24   prototypical form of bias" if "[a] reasonable jury might have received a significantly different

25   impression of [the witness'] credibility had respondent's counsel been permitted to pursue his

26   proposed line of cross-examination").  Van Arsdall, 475 U.S. at 680.  However, "[t]rial judges

18

1   retain wide latitude insofar as the Confrontation Clause is concerned" and may impose

2   limitations on cross-examination that are "reasonable' and are not "arbitrary or disproportionate

3   to the purposes they are designed to serve." Id. at 679.  See also Michigan v. Lucas, 500 U.S.

4   145, 151 (1991).  "The Confrontation Clause guarantees an opportunity for effective

5   cross-examination, not cross-examination that is effective in whatever way, and to whatever

6   extent, the defense might wish." Van Arsdall, 475 U.S. at 679 (quoting Delaware v. Fensterer,

7   474 U.S. 15, 20 (1985)).  The Ninth Circuit utilizes a three-part test to determine whether a trial

8   court violated the Confrontation Clause, considering: "(1) whether the excluded evidence was

9   relevant; (2) whether there were other legitimate interests outweighing the defendant's interest in

10  presenting the evidence; and (3) whether the exclusion of evidence left the jury with sufficient

11  information to assess the credibility of the witness." Larson, 460 F.3d at 1207.

12          The improper denial of a defendant's opportunity to impeach a witness for bias is

13  subject to a harmless-error analysis.  Van Arsdall, 475 U.S. at 684; Bockting v. Bayer, 399 F.3d

14  1010, 1020 (9th Cir. 2005) ("Confrontation Clause violations are subject to harmless error

15  analysis and thus may be excused depending on the state of the evidence at trial"), overruled on

16  other grounds by Whorton v. Bockting, ___ U.S. ___, 127 S. Ct. 1173 (2007).  Thus, in this case

17  petitioner is not entitled to relief unless he can establish that the trial court's error "had

18  substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

19  Abrahamson, 507 U.S. 619, 637 (1993).  See also Forn v. Hornung 343 F.3d 990, 999 (9th Cir.

20  2003) (finding that a Confrontation Clause error did not have a "substantial and injurious" effect

21  on the verdict and that the error was therefore harmless).

22          In order to grant habeas relief where a state court has determined that a

23  constitutional error was harmless, a reviewing court must determine: (1) that the state court's

24  decision was "contrary to" or an "unreasonable application" of Supreme Court harmless error

25  precedent, and (2) that the petitioner suffered prejudice under Brecht from the constitutional

26  error.  Inthavong v. LaMarque, 420 F.3d 1055, 1059 (9th Cir. 2005); see also Mitchell v.

Esparza, 540 U.S. 12, 17-18 (2003) (when a state court determines that a constitutional error is harmless, a federal court may not award habeas relief under § 2254 unless that harmlessness determination itself was unreasonable).  Both of these tests must be satisfied before relief can be granted.  Inthavong, 420 F.3d at 1061; see also Fry v. Pliler, ___ U.S. ___, 127 S. Ct. 2321, 2328 (2007) ("in § 2254 proceedings a federal court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht, 507 U.S. 619, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [v. California], 386 U.S. 18").

Assuming arguendo that the trial court erred in not allowing petitioner to question Fairbanks about his potential exposure for attempted murder, petitioner has failed to demonstrate that the error resulted in any prejudice.  As explained by the state appellate court, the jury was advised by both defense counsel and the prosecutor that Fairbanks had received a much lower sentence than he otherwise may have because of his agreement to plead guilty and testify against petitioner.  Under these circumstances, petitioner's inability to also cross-examine Fairbanks regarding whether he faced a possible attempted murder charge exposing him to an even longer possible sentence if he did not agree to testify against petitioner could not have had a substantial and injurious effect on the verdict.  The state courts' conclusion to the same effect is not contrary to or an unreasonable application of Brecht.  Accordingly, petitioner is not entitled to habeas relief on this claim.  Inthavong, 420 F.3d at 1059.

C.  Jury Instruction Error

Petitioner raises two claims of jury instruction error.  After setting forth the applicable legal principles, the court will evaluate these claims in turn below.

1.  Legal Standards

A challenge to jury instructions does not generally state a federal constitutional claim.  See Middleton v. Cupp, 768 F.2d at 1085 (citing Engle v. Isaac, 456 U.S. at 119);

1   Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus is unavailable for

2   alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see

3   also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378,

4   1381 (9th Cir. 1986).  However, a "claim of error based upon a right not specifically guaranteed

5   by the Constitution may nonetheless form a ground for federal habeas corpus relief where its

6   impact so infects the entire trial that the resulting conviction violates the defendant's right to due

7   process." Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d

8   1107 (9th Cir. 1980)); See also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (To

9   prevail on such a claim petitioner must demonstrate that an erroneous instruction "so infected the

10  entire trial that the resulting conviction violates due process.")  The analysis for determining

11  whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is

12  similar to the analysis used in determining, under Brecht v. Abrahamson, 507 U.S. 619, 623

13  (1993), whether an error had "a substantial and injurious effect" on the outcome.  See McKinney

14  v. Rees, 993 F.2d 1378, 1385 (9th Cir. 1993).  Where, as here, the challenge is to a failure to give

15  an instruction, petitioner's burden is "especially heavy," because "[a]n omission, or an

16  incomplete instruction is less likely to be prejudicial than a misstatement of the law." Henderson

17  v. Kibbe, 431 U.S. 145, 155 (1977). See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir.

18  1997).

19          2.  Jury Instruction on "Intent and Knowledge"

20          Petitioner claims that his right to due process was violated by the failure of the

21  trial court to instruct the jurors, sua sponte, that they could find him guilty of assault with a

22  semiautomatic firearm as an aider and abettor only if they found that he knew and intended that a

23  firearm would be used in the robbery. (Pet. at 34.) Petitioner states that, despite conflicting

24  evidence on this point at trial, he was not aware that a .25 caliber pistol would be used during the

25  robbery of the Circuit City store.  (Id.) Petitioner makes the following argument in this regard:

26  /////

21

1
2
3
4

> The jury could have concluded that the scheme was created entirely by Adam Fairbanks, without petitioner's knowledge that his gun had been taken, and yet convicted petitioner as an aider and abettor because he shared the knowledge and intent as to the assaults and robbery.  Without the additional requirement of knowledge and intent with respect to the semiautomatic firearm, that element of Counts Three and Five has not been properly established.

5   (Id. at 38.)

6         The California Court of Appeal rejected petitioner's argument in this regard,

7   reasoning as follows:

8
9
10
11

> We need not decide whether "intent and knowledge of the nature of the firearm" is an element of the offense charged or whether the trial court should have so instructed.  Any error in failing to give such instruction is harmless beyond a reasonable doubt, because there is no reasonable possibility defendant would have achieved a better outcome had the instruction been given.  (Citation omitted.)

12
13
14
15
16
17
18

> It was undisputed that the .25 caliber used in the robbery was, in fact, a semiautomatic and was, in fact, defendant's gun.  The only point in dispute was how Fairbanks came to have it.  Fairbanks testified defendant gave it to him to use in the robbery; defendant put on evidence implying Fairbanks purloined it from defendant's home.  Thus, the issue, like most others in the case, came down to a credibility contest between defendant and Fairbanks.  If the jury believed Fairbanks, it would necessarily have concluded defendant knew the nature of the firearm and intended it to be used in the robbery.  The verdict shows the jury believed Fairbanks and disbelieved defendant on all material points.  Thus it could not have changed the outcome if defendant's proposed instruction had been given.

19   (Opinion at 27.)

20         The state appellate court's conclusion that any error resulting from the trial court's

21   failure to give the jury instruction suggested by petitioner was harmless is not contrary to or an

22   unreasonable application of Brecht.  Accordingly, petitioner is not entitled to habeas relief on this

23   jury instruction claim.  Inthavong, 420 F.3d at 1059.

24         3.  Jury Instruction on Lesser Included Offense

25         Petitioner's next jury instruction error claim is that his right to due process was

26   violated by the trial court's failure to instruct the jury, sua sponte, that assault with a deadly

22

weapon in violation of California Penal Code § 245(a) is a lesser included offense to the charge of assault with a semiautomatic firearm in violation of California Penal Code § 245(b).  (Pet. at 39-40.)[10]  The California Court of Appeals rejected this argument, reasoning that any error in this regard was harmless.  (Opinion at 28.)

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction.  See Beck v. Alabama, 447 U.S. 625, 638 (1980).  The Supreme Court has not decided whether this rationale also extends to non-capital cases.  See Turner v. Marshall, 63 F.3d 807, 818 (9th Cir. 1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999).  The Ninth Circuit, like several other federal circuits, has declined to extend Beck to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case.  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000), cert. denied 534 U.S. 839 (2001); Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984); see also Valles v. Lynaugh, 835 F.2d 126, 127 (5th Cir. 1988); Trujillo v. Sullivan, 815 F.2d 597, 602 (10th Cir. 1987); Perry v. Smith, 810 F.2d 1078, 1080 (11th Cir. 1987).

Because petitioner's was not a capital case, even assuming that assault with a deadly weapon is a lesser included offense of the charge of assault with a semiautomatic firearm, the state trial court's failure to sua sponte give a lesser included offense instruction did not rise to the level of a constitutional error for which federal habeas relief is available.  See Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question.").  To find a constitutional right to a lesser-included offense instruction in this non-capital case would require the application of a new rule of law, which the court may not do in a habeas proceeding.  Teague v. Lane, 489 U.S. 28 (1989); Solis, 219 F.3d at 929 (habeas relief for failure

---

[10]  Petitioner was convicted by the jury of the latter charge.

1  to instruct on lesser included offense in non-capital case barred by Teague because it would

2  require the application of a new constitutional rule); Turner, 63 F.3d at 819 (same).  Under these

3  circumstances, the decision of the California courts denying petitioner relief as to this claim was

4  not contrary to clearly established federal law.

5                                              CONCLUSION

6                Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

7  a writ of habeas corpus be denied.

8                These findings and recommendations are submitted to the United States District

9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10 days after being served with these findings and recommendations, any party may file written

11 objections with the court and serve a copy on all parties.  Such a document should be captioned

12 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13 shall be served and filed within ten days after service of the objections.  The parties are advised

14 that failure to file objections within the specified time may waive the right to appeal the District

15 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16 DATED: February 28, 2008.

17

18                                              _____

19                                              DALE A. DROZD
                                                UNITED STATES MAGISTRATE JUDGE

20 DAD:8
   ewing858.hc

21

22

23

24

25

26